UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| LUCILE J. BRADLEY, individually; | ) | CIV.  09-5032-JLV |
| RODNEY J. BRADLEY, individually; | ) | |
| LUCILE J. BRADLEY, as personal | ) | |
| representative of the estate of | ) | ORDER GRANTING IN PART |
| Mark E. Bradley; | ) | AND DENYING IN PART |
| LUCILE J. BRADLEY, | ) | PLAINTIFFS' MOTION FOR |
| RODNEY J. BRADLEY, and | ) | SUMMARY JUDGMENT |
| KERRIE E. APPLEGATE, as | ) | |
| co-trustees of the Mark E. Bradley | ) | |
| Residuary Trust, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MDC CREDIT CORPORATION, | ) | |
| f/k/a Midcoast Credit Corporation, | ) | |
| a New York corporation; and | ) | |
| PREMIUM ACQUISITIONS, INC., | ) | |
| f/k/a Midcoast Acquisition | ) | |
| Corporation, a Florida corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**INTRODUCTION**

Plaintiffs' complaint asserts breach of guaranty.  (Docket 1).  Plaintiffs

claim that by a guaranty agreement, defendants are obligated to indemnify

plaintiffs for an Internal Revenue Service tax liability, together with costs and

attorneys' fees related to the payment of the tax and defense against the IRS

claim, as well as the costs and attorneys' fees incurred in this litigation.  Id.

Defendants' answer admits the guaranty, but denies liability under that

agreement.  (Docket 30).  Defendants' counterclaim asserts an indemnity claim

for costs and attorneys' fees incurred to defend this action.  Id.  Plaintiffs filed a

motion for summary judgment.  (Docket 41).  The motion is ripe for resolution by the court.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.  Id. at 248.  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate.  Id.  However, the moving party is entitled to judgment as a matter of law if the nonmoving party has failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986).  In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

## FACTS

The undisputed material facts originate from plaintiffs' complaint (Docket 1), defendants' answer to the complaint (Docket 30),[1] plaintiffs' statement of disputed and undisputed material facts (Docket 43), and defendants' statement of undisputed material facts (Docket 47).[2]  Citations to the record will be made where appropriate.

Lucile and Mark Bradley, their daughter, Kerrie Applegate (through the Kerrie E. Applegate Irrevocable Trust) and their son, Rodney Bradley,

---

[1]Where defendants' answer admits the allegations of plaintiffs' complaint, references will be to the complaint.

[2]For summary judgment purposes the court must view the evidence in the light most favorable to defendants, the nonmoving parties.  Anderson, 477 U.S. at 256.

3

(collectively referred to as the "Bradleys") were the sole shareholders in a family-owned business, MB Enterprises, Inc., f/k/a PortaStorage Inc., which was a portable storage and waste removal business ("MBE" or "Company"). (Docket 43, ¶ 1).  In 2003, the Bradleys began the process of selling the business.  Id. at ¶ 2.  In September 2003, they sold the portable storage component of the business to another company.  Id. at ¶ 3.

In late 2003, Tony McDonald from Midcoast Investments, Inc. ("Midcoast") contacted Rodney Bradley to solicit the sale of the remainder of the Company to Midcoast.  Id. at ¶ 4.  Mr. McDonald explained that Midcoast was purchasing companies with cash assets and tax liability and converting them to debt collection businesses, using bad debt losses to offset the tax liability. Id. at ¶ 5.  By offsetting the tax liability, Midcoast could pay more for the company than the difference between the cash and tax liability.  Id. at ¶ 6.

The purchaser of the Company stock would be a newly formed entity, PST Investment, LLC ("PST").  Id. at ¶ 7.  Defendant Premium Acquisitions, Inc., formerly Midcoast Acquisition Corporation ("Midcoast Acquisitions"), was the sole member of PST.  Id. at ¶ 8.  Defendant MDC Credit Corporation, formerly  Midcoast Credit Corporation ("Midcoast Credit"), is associated with both PST and Midcoast Acquisitions.  Id. at ¶ 9.  At Midcoast's direction, the Bradleys transferred all non-cash assets out of the Company (including a transfer that resulted in the complete redemption of the Kerrie E. Applegate Irrevocable Trust's share of the Company) and changed the Company name to

PST Investments, Inc.  Id. at ¶ 10.  At the time of sale, the Company had about $3,451,280 in cash and $1,360,220 in tax liability.  (Docket 43 ¶ 11).

A Share Purchase Agreement was executed on January 30, 2004, between PST ("Purchaser") and PST Investments, Inc., f/k/a MB Enterprises, Inc., and Bradleys as the sole shareholders of the Company (collectively the "Sellers").  (Docket 45-3).  Contemporaneously, Midcoast Credit and Midcoast Acquisition ("Guarantors") executed a Guaranty whereby "Guarantors . . . unconditionally and irrevocably guarantee to Sellers . . . the prompt and faithful performance of all of Purchaser's obligations pursuant to the provisions of Article 9 of the Share Purchase Agreement (the 'Indemnification Obligations')."  (Docket 45-4, p. 1).[3]

By a Notice of Liability dated June 30, 2009, the IRS advised Rodney Bradley of an income tax liability of PST Investments, Inc., f/k/a MB Enterprises, Inc., for the fiscal year ending March 31, 2004.  (Docket 45-5).  The Notice of Liability Statement indicated an income tax liability of $1,360,220, together with accrued accuracy related penalties under the Internal Revenue Code, Section 6662(h), of $544,088, for a total due of $1,904,308.  Id. at p. 5.  The explanation for the assessment was as follows:

> It is determined that the purported stock sale by shareholders of PST Investments, Inc., f.k.a. MB Enterprises, Inc., f.k.a. Porta Storage, Inc. to Midcoast Acquisition Corporation and PST Investments, LLC

---

[3]Michael Bernstein executed the Share Purchase Agreement as president on behalf of PST and as president of both MidCoast Credit and MidCoast Acquisitions on the Guaranty.  (Dockets 45-3, p. 31 and 45-4, p. 4).

is not respected for tax purposes. . . . Rather, the stock sale and the transactions involving the sale of PST Investments, Inc., . . . assets to CAJ Enterprises, Inc., are determined to be, in substance, a sale of assets of PST Investments, Inc., . . . followed by a distribution by PST Investments, Inc., . . . of its proceeds to its shareholders. . . . In substance, the shareholders received a liquidating distribution from PST Investments, Inc., . . . . It has been determined that PST Investments, Inc., . . . ceased its business activity in 2004 and was insolvent.

In the alternative, the transaction is in substance, a sale of the assets of PST Investments, Inc., . . . to CAJ Enterprises, Inc., followed by a redemption of PST Investments, Inc., . . . stock owned by PST Investments, Inc., . . . shareholders (the shareholders before any alleged sale to Midcoast Acquisitions Corporation and PST Investments, LLC).

Id. at pp. 5-6.  Similar IRS statements were sent to Lucile J. Bradley, both individually and as personal representative of the estate of Mark E. Bradley.[4] (Dockets 53-2 and 53-3).

Bradleys served notice and made a demand upon PST, Midcoast Acquisitions and Midcoast Credit for payment of the IRS liability under the Share Purchase Agreement and Guaranty.  (Docket 43, ¶ 17).  Defendants claim they no longer own PST and refuse to perform under the Guaranty.  Id. at ¶ 18.

Plaintiffs contested the Notice of Liability statements in the United States Tax Court.  (Docket 47, ¶ 2).  The Tax Court scheduled a trial for May of 2010. Id. at ¶ 3.  The tax liability was resolved with the IRS by stipulation.  (Docket

---

[4]There was no tax liability assessment against the Mark E. Bradley Residuary Trust.  All further references will be limited to the estate of Mark E. Bradley.

6

60-1).  Rodney Bradley acknowledged a tax liability and interest through June 30, 2009, of $608,832.[5]  Id. at pp. 25-26.  Lucile Bradley, individually, acknowledged a tax liability and interest of $412,568.  Id. at pp. 30-31.  Lucile Bradley, as the personal representative of the estate of Mark Bradley, acknowledged a tax liability and interest of $380,986.  Id. at pp. 35-36.  These stipulations resulted in a decision of the United States Tax Court assessing a corresponding amount against each taxpayer.  Id. at pp. 40-41, 43-44, and 46-47.  As of September 1, 2010, plaintiffs owed $1,469,309.  Id. at p. 2.

## DISCUSSION

Section 10.4 of the Share Purchase Agreement states it, as well as the attached schedules and exhibits, "shall be governed by and construed under the laws of the State of Florida . . . ."  (Docket 45-3, p. 26).  In an order denying defendants' motion to dismiss, Chief Judge Karen E. Schreier concluded the Guaranty is an exhibit within the attachments to the Share Purchase Agreement.  (Docket 29, pp. 12-13).  Both documents must be interpreted under Florida law.  Id. at p. 13.

"Florida District Courts of Appeal are the law of Florida unless and until overruled by the Florida Supreme Court. . . . Thus, [a] federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would

---

[5]The balances due are net amounts, after setoffs for previously paid taxes.  Each shareholder's portion of the total tax is based on the percentage of stock each held in the Company.

decide the issue otherwise." <u>Liberty Mutual Insurance Company v. Aventura Engineering & Construction Corp.</u>, 534 F. Supp. 2d 1290, 1303 (S.D. Fla. 2008) (internal citation and quotation marks omitted).  "Florida courts interpreting [contracts] are guided by the plain meaning of the language used in the [contracts]." <u>Fidelity National Property and Casualty Company v. Boardwalk Condominium Association, Inc.</u>, No. 3:07cv278/MCR/EMT, 2010 WL 1911159 *4 (N.D. Fla. 2010) (internal quotation marks omitted).  "A provision that is clear and unambiguous should be enforced according to its terms . . . ." <u>Id.</u> (internal quotation marks omitted).

In Florida, "the generally accepted rule of law [is] that where an indemnitor has notice of a suit against his indemnitee, and is afforded an opportunity to appear and defend, a judgment therein rendered against the indemnitee, if without fraud or collusion, is conclusive against the indemnitor as to all material questions therein determined." <u>Wright v. Fidelity and Casualty Company of New York</u>, 139 So. 2d 913, 915 (Fla. App. 1962).  In <u>Chappell v. Scarborough</u>, 224 So. 2d 791 (Fla. App. 1969), the First District Court of Appeals of Florida clarified the far-reaching impact of the indemnification requirement.

> A mere claim or demand against an indemnitee when no legal liability exists does not give rise to a right to indemnity under an agreement to indemnify against liability in the sense of accrued liability. Where, however, the contract is so expressed as to protect the obligee against any claim, suit, or demand, even the institution of a suit against the obligee has been held to entitle him to an action against his guarantor.

Id. at 794.  "The foregoing common law principle pertaining to the law of indemnity has been recognized in this state,[6] and is controlling in a suit brought by an indemnitee against his indemnitor prior to the time the indemnitee's liability has been determined and imposed."  Id.  In Chappell, a cross-claim proceeded against the co-defendant, Scarborough, under the indemnity agreement even though plaintiff's claim had not been resolved.  Id. at 796.  The indemnity claim is "accelerated" and need not be "postponed until such time as liability may be imposed upon Chappell by the rendition of a judgment against him in favor of the plaintiff . . . ."  Id.

The Florida District Court, Tampa Division, reaffirmed that "contractual indemnity actions can be filed prior to judgment in the underlying case."  BP Products North America, Inc., v. Giant Oil, Inc., 545 F. Supp. 2d 1257, 1260 (M.D. Florida 2008).  "Courts have the authority to grant a stay of indemnity proceedings pending final judgment in a related . . . court action."  Id.  "It is clear that a judgment against an indemnitee, arising from a suit in which the indemnitor has knowledge and opportunity to defend, is binding (res judicata) on the indemnitor on all essential issues decided (in the absence of fraud or collusion)."  Hoskins v. Midland Insurance Company, 395 So. 2d 1159, 1161 (Fla. App. 1981).

---

[6]Referencing Wright v. Fidelity and Casualty Company of New York, 139 So. 2d 913 (Fla. App. 1962).

The Share Purchase Agreement specifically identifies the "Deferred Tax Liability" for the fiscal year ending March 31, 2004. (Docket 45-3, pp. 3-4). By Section 2.18 <u>Deferred Tax Liability</u> the parties agreed that "[a]s of Closing the Deferred Tax Liability is . . . $1,324,018.21. . . ." <u>Id.</u> at p. 12.

Under Section 2.8 <u>Retained Liabilities</u>, Purchaser would not assume any indebtedness of the Company, but that section "specifically exclude[s] the combined United States and state income tax liability of the Company (the "Deferred Tax Liability") for the fiscal year ending March 31, 2004." <u>Id.</u> at p. 4. Section 4.8 <u>No Liabilities</u> affirms that as of "[c]losing, the Company shall be subject to no Liabilities except for the Deferred Tax Liability . . . ." <u>Id.</u> at p. 15. According to Section 6.7 <u>Taxes and Tax Filings</u>, "Sellers agree to prepare . . . at their sole cost and expense . . . all Tax Returns . . . for all periods up to and including the Closing, except for the . . . federal tax returns for the Company's fiscal year ending March 31, 2004 . . . ." Furthermore, "Sellers agree to . . . reimburse the Company for all Taxes . . . due . . . , except for . . . federal income taxes for the Company's fiscal year ending March 31, 2004." <u>Id.</u> at p. 17. Section 6.7 addresses the 2004 fiscal year taxes, as follows:

> Notwithstanding anything else contained in this Agreement to the contrary, the Purchaser's sole responsibility for preparation of tax returns and payment of taxes arising prior to the Closing shall be for preparing (at its sole expense) and filing the Company's state and federal income tax returns for the Company's fiscal year ended March 31, 2004 and paying the federal and state income taxes, if any, attributable thereto.

<u>Id.</u> at pp. 17-18.

The Share Purchase Agreement contains an indemnification provision.

Section 9.2 <u>Indemnification Obligation of the Purchaser</u> provides, in pertinent part, as follows:

> After the Closing Date, the Purchaser will jointly and severally reimburse, indemnify and hold harmless the Sellers and their heirs, legal representatives, successors or assigns (an "Indemnified Seller Party") against and in respect of any and all claims (including those that if successful would constitute an indemnifiable claim), damages, losses, deficiencies, liabilities, penalties, costs and expenses (including reasonable legal fees and expenses) incurred or suffered by any Indemnified Seller Party that results from, relates to or arises out of:
>
> (a)    any . . . breach of warranty or nonfulfillment of any agreement or covenant on the part of the Purchaser under this Agreement . . . . ;
>
> . . . .
>
> (c)    the failure to discharge the Deferred Tax Liability when due or any claim against an Indemnified Seller Party with respect to the Deferred Tax Liability;
>
> (d)    any costs and expenses, including reasonable attorney and accountant fees and expenses incurred in connection with the enforcement of this indemnification.

<u>Id.</u> at p. 23.  Section 9.3 <u>Method of Asserting Claims, etc.</u> establishes the notice requirements to invoke the purchaser's indemnification obligations.[7]  That section provides, in pertinent part, the following:

_____

[7]By Section 9.3.5 the same procedure is used for any claim for indemnification by either party.  That section states: "[a]ll claims for indemnification by an Indemnified Seller Party under this Agreement shall be asserted and resolved under the procedures set forth above substituting in the appropriate place "Indemnified Seller Party" for "Indemnified Purchaser Party" and variations thereof and "Purchaser" for "Sellers."  <u>Id.</u> at p. 25.  To understand Sellers' rights under Section 9.3, those obligations have been reversed.  Where appropriate, modifications to verbs and third person possessives are also made for readability.

In the event that any claim or demand for which the Purchaser would be liable to an Indemnified Seller Party . . . is asserted against or sought to be collected from an Indemnified Seller Party by a third party, the Indemnified Seller Party shall promptly notify the Purchaser of such claim or demand, specifying the nature of such claim or demand and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim and demand) (the "Claim Notice"). The Purchaser shall have thirty (30) days from . . . mailing of the Claim Notice . . . to notify the Indemnified Seller Party: (a) whether or not [it] dispute[s] [its] liability to the Indemnified Seller Party . . . with respect to such claim or demand; and (b) notwithstanding any such dispute, whether or not [it] desire[s], at [its] sole cost and expense to defend  the Indemnified Seller Party against such claim or demand . . . . In the event that the Purchaser dispute[s] [its] liability with respect to such claim or demand or the amount thereof (whether or not the Purchaser desire[s] to defend the Indemnified Seller Party against such claim or demand as provided by 9.3.2. and 9.3.3 below), such dispute shall be resolved in accordance with this Section 9.3. Pending the resolution of any dispute by the Purchaser of [its] liability with respect to any claim or demand, such claim or demand shall not be settled without the prior written consent of the Indemnified Seller Party and the Purchaser, which consent by the Purchaser shall not be unreasonably withheld, delayed or conditioned.

Id.

Once notice of a third-party claim is given, Purchaser's options are set out in Sections 9.3.2 and 9.3.3.  If the Purchaser chooses to defend Sellers against the third-party claim, the parties' rights are established in Section 9.3.2.  That section, in pertinent part, provides as follows:

In the event that the Purchaser notif[ies] the Indemnified Seller Party within the Notice Period that [it] desire[s] to defend the Indemnified Seller Party against such claim or demand then, except as hereinafter provided, the Purchaser shall have the right to defend the Indemnified Seller Party by appropriate proceedings, which proceedings shall be promptly settled or prosecuted by [it] to a final conclusion . . . as to avoid any material risk of any Indemnified Seller Party becoming subject to liability for any other matter; provided, however, the Purchaser shall have first notified the Indemnified Seller Party of the

attorney who has been selected by the Purchaser to represent them in the defense of such action and such person is reasonably acceptable to the Indemnified Seller Party, and the Purchaser shall not, without the prior consent of the Indemnified Seller Party, which consent shall not be unreasonably withheld, delayed or conditioned, consent to the entry of any judgment against the Indemnified Seller Party or enter into any settlement or compromise which does not include, as an unconditional term thereof, the giving by the claimant . . . to the Indemnified Seller Party of a release . . . from all liability in respect to such claim or litigation.  If any Indemnified Seller Party desires to participate in, but not control, any such defense or settlement, [they] may do so at [their] own cost and expense.  If, in the reasonable opinion of any Indemnified Seller Party, any such claim or demand or the litigation or resolution of any such claim or demand involves an issue or matter which could have a materially adverse effect on the business, operations, assets, properties or prospects of any Indemnified Seller Party, including the administration of the tax returns and responsibilities of any Indemnified Seller Party under the tax laws, then the Indemnified Seller Party shall have the right to control the defense or settlement of any such claim or demand and its reasonable costs and expenses shall be included as part of the indemnification obligation of the Purchaser hereunder; <u>provided, however</u>, that the Indemnified Seller Party shall not settle any such claim or demand without the prior written consent of the Purchaser which consent shall not be unreasonably withheld.  If the Indemnified Seller Party should elect to exercise such right, the Purchaser shall have the right to participate in, but not control, the defense or settlement of such claim or demand at its sole cost and expense.

<u>Id.</u> at pp. 23-24 (underlining in original).

     If Purchaser chooses not to defend against any third-party claim, the parties' rights are outlined in Section 9.3.3.  That section provides, as follows:

If the Purchaser elect[s] not to defend the Indemnified Seller Party against such claim or demand, whether by not giving the Indemnified Seller Party timely notice as provided above or otherwise, then the amount of any such claim or demand, or if the same be defended by the Purchaser or by the Indemnified Seller Party (but none of the Indemnified Seller Party shall have any obligation to defend any such claim or demand), then that portion thereof as to which such defense is unsuccessful, in each case with respect to the defense costs of the Indemnified Seller Party shall be conclusively deemed to be a joint

> and several liability of the Purchaser hereunder . . . unless the
> Purchaser shall have disputed [its] liability to the Indemnified Seller
> Party hereunder.

Id. at p. 24.

Once a third-party claim is resolved, Purchaser's obligation to pay the claim is mandatory.  See  Section 9.4 Payment.  That section provides, in pertinent part, that: "[u]pon the determination of the liability under this Article 9, the appropriate party shall pay to the other, as the case may be, within ten (10) days after such determination, the amount of any claim for indemnification made hereunder . . . ."  Id. at p. 25.

Section 10.20 Breach of Agreement limits the rights of either party to proceed to recover damages.  That section provides that "[n]o party shall be entitled to recover damages for breach of contract or for breach of any warranty or representation hereunder unless and until such party shall have incurred actual damages as a result of such breach."  Id. at p. 29.

Section 10.19 Attorneys' Fees establishes the right of either party to recover attorneys' fees.  That section provides:

> If any party shall commence any action or proceeding . . . against
> another party in order to enforce the provisions hereof, or to recover
> damages resulting from the alleged breach of any of the provisions
> hereof, the prevailing party therein shall be entitled to recover all
> reasonable costs incurred in connection therewith, including without
> limitation reasonable attorney's fees.

Id.

These Share Purchase Agreement provisions establish the parties' rights and obligations.  Defendants' obligations must then be examined in light of the

14

Guaranty.  The Guaranty was signed on January 30, 2004, contemporaneously with the Share Purchase Agreement.  (Docket 45-4, p. 1 compared to Docket 45-3, p. 2).  Executed by MidCoast Credit and MidCoast Acquisition, the Guaranty refers to them, both individually and collectively, as the "Guarantors."  (Docket 45-4, p. 1).  Consideration for the Guaranty is stated "as an inducement for Purchaser and Sellers to enter into the Share Purchase Agreement and for other good and value [sic] consideration, the receipt and sufficiency of which are hereby acknowledged . . . ."  Id.

Guarantors agree to "unconditionally and irrevocably guarantee to Sellers and their heirs, legal representatives, successors or assigns, the prompt and faithful performance of all of Purchaser's obligations pursuant to the provisions of Article 9 of the Share Purchase Agreement (the "Indemnification Obligations").  Id.  The Guaranty also identifies Guarantors' separate obligations.

> If Purchaser defaults in the performance of any of the Indemnification Obligations, Guarantors shall pay on demand (i) any sums owed to Sellers pursuant to the Indemnification Obligations, (ii) any damages, costs and expenses entitled to be recovered from Sellers by reason of such non-payment and (iii) reasonable attorney's fees and all costs and other expenses incurred by Sellers as a result of any Indemnification Obligation or enforcing this Guaranty. . . .

Id.

Sellers' rights to proceed against the Guarantors appear in paragraph 3 of the Guaranty.  That section provides, as follows:

> In the event of a default by Purchaser in the performance of its Indemnification Obligations, Sellers shall be entitled to commence

15

> any action or proceeding against Guarantors or otherwise exercise any available remedy at law or in equity to enforce the provisions of this Guaranty without first commencing any action . . . against Purchaser or otherwise exhausting any or all of its remedies against Purchaser, it being expressly agreed . . . that Guarantors' liability under this Guaranty shall be primary from and after any non-performance by Purchaser of its Indemnification Obligations.

Id. at p. 2.  The Guaranty has an attorneys' fees provision similar to Section 10.19 of the Share Purchase Agreement.  The Guaranty states that:

> If any party shall commence any action or proceeding . . . against another party in order to enforce the provisions hereof, or to recover damages resulting from the alleged breach of any of the provisions hereof, the prevailing party therein shall be entitled to recover all reasonable costs incurred in connection therewith, including without limitation reasonable attorneys' fees.  Guarantors hereby waive any requirement of joinder of all or any other parties hereto in any suit or proceeding to enforce the provisions of this Guaranty.

Id. at ¶ 8.

The Share Purchase Agreement and Guaranty are clear, unambiguous, and enforceable under the plain meaning of the language of both documents. Fidelity National Property, 2010 WL 1911159 at *4.  Plaintiffs gave notice and made a demand of PST and these defendants, as Guarantors, for payment of the IRS liability.  (Docket 43, ¶ 17).  Defendants refuse to perform.  Id. at ¶ 18. Where Guarantors were given notice of the claim and had the opportunity to substitute themselves in the IRS proceedings, but chose instead to refuse to perform under the Guaranty, the IRS judgment is conclusive and final against the defendants.  Wright, 139 So. 2d at 915.  The IRS decision is *res judicata* and binding against defendants in this case.  Hoskins, 395 So. 2d at 1161.

16

Defendants' argument that filing this litigation was premature is simply without merit.  Under the clear language of both documents and Florida law, the Notice of Liability is undisputably a "claim or demand" made against plaintiffs with respect to the 2004 federal income tax liability identified in the Share Purchase Agreement.  By Section 6.7 of the Share Purchase Agreement, the Purchaser agreed to be solely responsible for the "preparation of tax returns and . . . filing the Company's . . . federal income tax returns for the Company's fiscal year ending March 31, 2004 and paying the federal . . . income taxes, if any, attributable thereto."  (Docket 45-3, pp. 17-18) (emphasis added).

It is no mere coincidence that the 2004 tax assessment by the IRS is over one million dollars.  At closing the parties agreed Purchaser was assuming responsibility for the Deferred Tax Liability of $1,324,018.21.  (Docket 45-3, p. 12).  The Notice of Liability identifies an income tax liability for PST Investments, Inc., of $1,360,220.  (Docket 45-5).   This is in the same range of potential taxes anticipated by Section 2.18 of the Share Purchase Agreement.  (Docket 45-3, p. 12).

It is the "claim or demand" of the tax liability by the IRS which triggered defendants' duty of indemnification.  Instead of acknowledging their duty to take over the tax appeal and accepting responsibility for payment of any tax due, the defendants chose to do nothing.  Defendants point to subsection (ii) of paragraph 2 of the Guaranty to argue their exposure is limited to "any damages" suffered by plaintiffs.  (Docket 46, p. 4).  This argument ignores both

the Purchaser's obligation under the Share Purchase Agreement and the

Guarantors' obligation under the Guaranty to "pay upon demand (i) any sums

owed to Sellers pursuant to the Indemnification Obligations . . . ." (Docket 45-

4, p. 1).  By Section 9.2 of the Share Purchase Agreement, Purchaser, and thus

the Guarantors, have the duty to:

> reimburse, indemnify and hold harmless the Sellers . . . against and
> in respect of any and all claims (including those that if successful
> would constitute an indemnifiable claim), damages, losses, . . .
> penalties, costs and expenses (including reasonable legal fees and
> expenses) . . . that results from, relates to or arises out of: . . . . (c) the
> failure to discharge the Deferred Tax Liability when due or any claim
> against [Sellers] with respect to the Deferred Tax Liability . . . .

(Docket 45-3, p. 23).  The Notice of Liability is clearly both a "claim" and a

"claim[] [which] . . . if successful would constitute an indemnifiable claim"

contemplated by the language of Section 9.2.   It also constitutes a "loss," a

"penalty," and "damages" (in the form of interest on the unpaid tax and

penalties) also contemplated by Section 9.2.  The Notice of Liability is the

anticipated and natural consequence of "the failure to discharge the Deferred

Tax Liability when due or any claim against [Sellers] with respect to the

Deferred Tax Liability."  See Section 9.2(c) of the Share Purchase Agreement.

(Docket 45-3, p. 23).

The Notice of Liability Statement identifies the specific basis for the

calculation of the unpaid tax and penalties.  (Docket 45-5, pp. 5-6).  It was the

very transaction which Mr. McDonald explained to the Bradleys while

negotiating for the purchase of the Company.  Not only the Purchaser, PST, but

also the Guarantors, MidCoast Credit and MidCoast Acquisition, knew this potential tax liability existed and knew that eventually the day would come when the IRS would assert its claim.  Purchaser was in the best position to offset any tax liability with its other bad debt associated expenses.  (Docket 43, ¶ 5).  That is why the parties agreed Purchaser would be responsible for filing the 2004 tax return and paying any federal income taxes due–the Deferred Tax Liability.

Defendants allege it was premature for plaintiffs to file their lawsuit when they did.  (Dockets 30, ¶ 2 and 46, p. 4).  This argument is without merit.   The Share Purchase Agreement is expressly written to protect the Sellers against any claim or demand made by the IRS on the Deferred Tax Liability and, under Florida law, plaintiffs are entitled to initiate this litigation.  Chappell, 224 So. 2d at 794; BP Products North America, Inc., 545 F. Supp. 2d at 1260.  The indemnity claim does not need to be "postponed until such time as liability may be imposed upon [Sellers] by the rendition of a judgment against [them] in favor of the [IRS]."  Chappell, 224 So. 2d at 796.

Not only did the potential for a tax liability exist, but now an actual tax liability exists.  The Share Purchase Agreement and the Guaranty compel defendants, as Guarantors, to pay directly in full the IRS total federal income tax liability, as well as all penalties and interest assessments.  Should defendants fail to pay the IRS, then upon proof of full payment by Bradleys,

plaintiffs are entitled to a money judgment against defendants, both jointly and severally, for the total sum paid.

It is also clear by the plain and unambiguous language of both the Share Purchase Agreement and the Guaranty that plaintiffs are entitled to recover their attorneys' fees.  The right to recovery of their "costs and expenses, including reasonable attorney and accountant fees and expenses incurred in connection with the enforcement" of the indemnification paragraph is specifically set forth in Section 9.2(d).  The breach of Purchaser's obligation to pay the federal income taxes is set forth in Section 10.19.  (Docket 45-3, pp. 23 and 29).  See also the Guaranty ¶ 8 (Sellers' right "to recover all reasonable costs in connection [with the breach of the Guaranty], including without limitation reasonable attorneys' fees.").  (Docket 45-4, p. 2).

Plaintiffs submitted a generalized statement from Rodney J. Bradley of the costs and expenses, including attorneys' fees, incurred to the date of their motion for summary judgment.  (Docket 45).  That submission is inadequate to allow the court to properly consider assessment of costs and fees against the defendants.  The submission is also incomplete in that at the time of plaintiffs' motion for summary judgment (1) the United States Tax Court proceedings were not yet completed; and (2) this present litigation was still pending.

By the unambiguous language of both documents, plaintiffs are entitled to recover from defendants, both jointly and severally, all reasonable fees incurred in the United States Tax Court proceedings and for defendants' breach

20

of their Guaranty obligations.  Both documents clearly contemplate an award of plaintiffs' fees and costs in this litigation.

Defendants' counterclaim (Docket 30) seeks indemnification of their attorneys' fees under Section 9.1, <u>Indemnification Obligations of the Sellers</u>, of the Share Purchase Agreement.  (Docket 45-3, pp. 20-22).  Plaintiffs are the prevailing party and defendants are not entitled to indemnification under the agreement.  Defendants' counterclaim should be dismissed with prejudice.

**ORDER**

Based upon the foregoing discussion, it is hereby

ORDERED that plaintiffs' motion for summary judgment (Docket 41) is granted in part and denied in part.

IT IS FURTHER ORDERED that plaintiffs are entitled to entry of a declaratory judgment with respect to the plaintiffs' rights and defendants' obligations under the Share Purchase Agreement and the Guaranty.

IT IS FURTHER ORDERED that under the Guaranty dated January 31, 2004, the defendants, MDC Credit Corporation, f/k/a Midcoast Credit Corporation, and Premium Acquisitions, Inc., f/k/a Midcoast Acquisition Corporation, are jointly and severally responsible for the payment of the federal income tax liability, penalties and interest, for the fiscal year ending March 31, 2004, assessed against PST Investments, Inc., and its former shareholders, Rodney Bradley, Lucile Bradley, and Lucile Bradley, as Personal Representative of the Estate of Mark E. Bradley, Deceased, totaling  $1,469,309 as of September 1, 2010, together with additional penalties and interest assessed to the date of full payment (hereinafter the "IRS Tax Liability").

IT IS FURTHER ORDERED that if the defendants fail to pay the IRS Tax Liability on or before **May 2, 2011**, then upon Bradleys' payment of the IRS Tax Liability, plaintiffs may apply for a money judgment against the defendants, jointly and severally, for such amount.

IT IS FURTHER ORDERED that upon submission of an application and documentation to support a claim for costs and expenses, including attorneys' and accountants' fees, incurred by plaintiffs in the United States Tax Court proceedings and this litigation (hereinafter the "Plaintiffs' Costs and Fees Application"), the court will consider the application for assessment against the defendants, jointly and severally, under the Share Agreement and Guaranty.

IT IS FURTHER ORDERED that defendants may file a response to Plaintiffs' Costs and Fees Application within fourteen (14) days of plaintiffs' submission.

IT IS FURTHER ORDERED that any reply by plaintiffs in support of Plaintiffs' Costs and Fees Application must be filed within fourteen (14) days thereafter.

IT IS FURTHER ORDERED that defendants' counterclaim (Docket 30) is dismissed with prejudice.

Dated March 4, 2011.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE